*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ANTHONY WAYNE SHOTWELL,

      Defendant-Appellant.

UNPUBLISHED
May 30, 2024

No. 363283
Ingham Circuit Court
LC No. 19-000859-FH

Before: MARKEY, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

A jury convicted defendant of causing or persuading a child to engage in child sexually abusive activity (CSAA), MCL 750.145c(2)(a), using a computer to commit the crime of CSAA, MCL 752.796 and MCL 752.797(3)(f), possession of child sexually abusive material (CSAM), MCL 750.145c(4)(a), using a computer to commit the crime of CSAM, MCL 752.796 and MCL 752.797(3)(d), third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b) (sexual penetration accomplished by force or coercion), and two counts of fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e(1)(b) (sexual contact accomplished by force or coercion). The trial court sentenced defendant to serve concurrent terms of 7 to 20 years' imprisonment for the CSAA conviction, 5 to 20 years' imprisonment for the using-a-computer-CSAA conviction, 23 to 84 months' imprisonment for the using-a-computer-CSAM conviction, 7 to 15 years' imprisonment for the CSC-III conviction, and 365 days' incarceration for the CSAM and CSC-IV convictions. Defendant appeals by right, challenging both his convictions and sentences on constitutional and nonconstitutional grounds. We affirm.

## I. BACKGROUND

The events of this case occurred during the summer of 2019. Defendant, who was 50 years old and married at the time, began communicating with the female complainant, SMS, who was 16 years old and lived with her parents in the summer of 2019. The two met at a motorcycle club to which defendant and SMS's father belonged. SMS would sometimes accompany her father to the club. SMS did not have many friends and was shy, and she testified that her father encouraged her to talk to defendant. SMS and defendant communicated almost exclusively through Facebook

-1-

Messenger. At first, their communications remained platonic; however, SMS testified that defendant eventually expressed feelings for her. Moreover, defendant began pushing SMS to send him more and more revealing images of herself. SMS felt pressured, and she subsequently complied, sending images and videos of herself in various stages of undress, including images in which she was nude and performing sexual acts requested by defendant. The police later recovered many of these images and videos from defendant's cellphone, and they were admitted into evidence.

SMS also described two sexual assaults committed against her by defendant. He came over to SMS's house one day to drop off a motorcycle jack for SMS's father. SMS testified that she took defendant to a shed to unlock it and put the jack away, and she went inside the shed with defendant. SMS further testified that she and defendant may have been hugging when defendant suddenly began groping her breasts, buttocks, and vagina. Defendant penetrated SMS's vagina with his fingers. She did not ask defendant to perform these actions, nor did she want defendant to engage in the conduct, but SMS did not feel as if she could leave or tell defendant to stop. SMS testified that she was afraid and did not know what to do. SMS described a similar assault that occurred shortly thereafter during defendant's same visit to her home. She testified that she went into the basement with defendant to look for a ratchet strap. SMS explained how defendant grabbed her arm and tried to make her touch his penis. Although she tried to pull her arm away, she was unable to do so because of defendant's superior strength. Defendant pulled down SMS's pants and tried to penetrate her vagina with his penis. He was unable to accomplish the act, but defendant did rub his penis against her vagina. Similar to the incident in the shed, SMS did not feel that she could leave or tell defendant to stop; she described herself as being afraid and in shock. SMS did not tell her parents or anybody else about the sexual assaults or communications with defendant.

After defendant and his wife obtained new cellphones on August 24, 2019, defendant's wife discovered the communications between defendant and SMS and began to suspect the predatory nature of their relationship. Defendant's wife took his old cellphone on August 27, 2019, which was still logged into defendant's various phone accounts, including Facebook, and she was able to see the messages exchanged between defendant and SMS. Defendant's wife screenshot as many of the messages as she could, which were admitted into evidence at trial. She contacted Children's Protected Services (CPS) and turned over the screenshot messages. And around September 6, 2019, defendant's wife turned his cellphone over to police. A detective performed a forensic examination of defendant's phone, and he found various sexually-inappropriate images and videos of SMS. The detective created a forensic report, which was admitted into evidence, and he testified at trial.

Police interviewed defendant about the messages, and he denied exchanging any nude images with SMS. Although he acknowledged that he had communicated with SMS, he claimed that it was because her parents wanted her to overcome her shyness. At trial, defendant again acknowledged his communications with SMS; however, he denied that they were sexual in nature. He also denied exchanging any sexual images or videos with SMS, and defendant denied sexually assaulting her. He claimed that SMS was never in the shed with him, that SMS's mother unlocked the shed, and that both SMS and her mother had gone into the basement with defendant.

During the trial, the prosecution asked defendant's wife about what actions she took when she saw the messages between defendant and SMS. She replied, "I reached out to the CPS worker I just had on a case for accusations against him and my daughter for the similar thing and told her what I found." Later, the prosecution asked defendant's wife if she continued to reside with defendant, and she responded, "CPS asked him to leave the house just because we had a case end against him and my daughter." Defense counsel objected on the grounds that this was improper, unnoticed other-acts evidence. Although he conceded that the prosecution did not intentionally elicit the answers, defense counsel nonetheless raised concerns over defendant's ability to obtain a fair trial in light of the jury hearing the testimony. Defense counsel moved for a mistrial or, alternatively, a curative instruction. The trial court declined to order a mistrial and immediately gave the following curative instruction to the jury:

> Ladies and gentlemen of the jury, any testimony regarding prior Child Protective Services allegations or involvement should be disregarded and not considered for any purpose in this case. You are not to speculate about these statements in any way. No negative inferences towards the Defendant can be drawn from this testimony.

The jury found defendant guilty on all counts.

At sentencing, the prosecution argued that for purposes of the CSAA conviction, Offense Variable (OV) 4 should be assessed at 10 points because SMS suffered serious psychological injury, and the trial court agreed over defense counsel's opposition. Further, the prosecution contended that with respect to the CSAA conviction, OV 12 should be scored at 25 points because there were three or more contemporaneous felonious criminal acts that occurred within 24 hours of the conduct that gave rise to the CSAA conviction. The prosecution reasoned that defendant had been charged with and convicted of only one count of CSAM but that there were more than three other CSAM images. The trial court agreed with the prosecution over defendant's objection. Consequently, the total OV score for the CSAA conviction was 75 points, resulting in a minimum sentence guidelines range of 57 to 95 months, which was the highest range of all of defendant's crimes. The trial court sentenced defendant to serve 7 to 20 years' imprisonment for the CSAA conviction. Additionally, defendant was ordered to register under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*

After sentencing and the filing of this appeal, defendant moved the trial court to correct an invalid sentence, correct the presentence investigation report (PSIR), and to resentence him. Defendant raised many of the same issues now raised on appeal. He contended that OVs 4 and 12 were improperly assessed because the evidence at trial and PSIR provided insufficient support for the scores. Defendant also maintained that requiring him to register under the 2021 version of SORA (MCL 28.721 *et seq.*, as amended by 2020 PA 295) constituted ex post facto punishment and was thus unconstitutional. He further asserted that requiring him to register under the 2021 SORA for life was both cruel and unusual punishment under the United States Constitution and cruel or unusual punishment under the Michigan Constitution. He therefore requested that the trial court vacate the SORA-registration portion of his sentence. The trial court rejected all of defendant's arguments. This appeal ensued.

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support the jury's determination that he used force or coercion against SMS in relation to the CSC-III and CSC-IV convictions. We disagree.

In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court articulated the well-established principles that govern our review of a sufficiency argument:

> This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

With respect to the CSC-III conviction, MCL 750.520d(1)(b) requires the prosecution to prove that a defendant engaged in "sexual penetration" with a person and that "[f]orce or coercion [was] used to accomplish the sexual penetration." Similarly, in regard to the CSC-IV convictions, MCL 750.520e(1)(b) requires the prosecutor to prove that a defendant engaged in "sexual contact" with a person and that "[f]orce or coercion [was] used to accomplish the sexual contact." Defendant challenges only the element of "force or coercion." For purposes of CSC-III, "[f]orce or coercion includes but is not limited to any of the circumstances listed in section 520b(1)(f)(*i*) to (*v*)." MCL 750.520d(1)(b). And MCL 750.520b(1)(f) defines "force or coercion" to include, in relevant part, the following circumstances:

> (*i*) When the actor overcomes the victim through the actual application of physical force or physical violence.
>
> * * *
>
> (*v*) When the actor, through concealment or by the element of surprise, is able to overcome the victim.

For purposes of CSC-IV, the definition of "force or coercion" is nearly identical. See MCL 750.520e(1)(b)(*i*) and (*v*).

In the context of the CSC offenses, this Court has defined "force" to "include[], among other things, strength or power exerted upon an object." *People v Premo*, 213 Mich App 406, 409; 540 NW2d 715 (1995) (quotation marks and citation omitted). An act of physical force "requires a person to exert strength or power on another person." *Id*.

In the instant case, with respect to the CSC-IV offenses committed in the basement, there was testimony that defendant grabbed SMS's arm and tried to make her touch his penis. She testified that she tried to pull her arm away. Furthermore, SMS testified that defendant pulled down her pants in an effort to penetrate her with his penis. She indicated that defendant was "too strong" and that there was "nothing to really do, so I just gave up." This testimony supported a finding that defendant used actual force against SMS in accomplishing the sexual contact. See *Premo*, 213 Mich App at 409 (holding that "pinching of the victims' buttocks satisfies the force element of the statute because the act of pinching requires the actual application of physical force") (quotation marks and citation omitted). Accordingly, we hold that there was sufficient evidence that defendant used force or coercion to engage in sexual contact with SMS.

In regard to the CSC-III offense, SMS testified that in the shed, she and defendant may have been hugging when defendant suddenly began groping her breasts, buttocks, and vagina, after which he penetrated her vagina with his fingers. SMS explained that she "was just very scared," that she did not know what was happening, and that she did not know what to do. The evidence supported a determination that SMS was overcome by both through surprise and physical force. Her testimony suggested that defendant's actions began through innocent hugging but rapidly devolved into unwanted sexual contact and penetration with his fingers. SMS's testimony demonstrated that in light of the surprise, she did not know what was happening and that her mind could not gauge on how to best proceed under the circumstances. Additionally, defendant physically held SMS, groped her, and penetrated her with his fingers. SMS felt scared and did not believe that she could simply leave or tell defendant to stop. There was also a vast age difference between the two, which defendant thoroughly exploited. In sum, we conclude that there was sufficient evidence that defendant employed force or coercion to sexually penetrate SMS.[1]

## B. OTHER-ACTS EVIDENCE

Defendant next argues that his wife's testimony concerning the separate CPS case constituted improper other-acts evidence that deprived him of a fair trial. We disagree.

We review a trial court's decision on a motion for mistrial for an abuse of discretion. *People v Boshell*, 337 Mich App 332, 335; 975 NW2d 72 (2021). A trial court's ruling on the admissibility of evidence is likewise reviewed for an abuse of discretion, although preliminary questions of law bearing on admissibility, e.g., whether a rule of evidence bars admission of the testimony at issue, are reviewed de novo. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693

---

[1] To the extent that defendant argues that the jury should have placed more weight on the evidence that suggested SMS had consented to the sexual acts, we note that "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

(2019); *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). A court abuses its discretion when its decision falls "outside the range of principled outcomes." *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012). We review de novo constitutional issues. *People v Pennington*, 240 Mich App 188, 191; 610 NW2d 608 (2000).

The Due Process Clauses of both the United States and Michigan Constitutions guarantee a defendant a fair trial and due process of law. US Const, Am XIV; Const 1963, art 1, § 17; *Boshell*, 337 Mich App at 335-336. Other-acts evidence "is not admissible to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1).[2] Furthermore, if the prosecution intends to use such evidence, it must provide a defendant written notice at least 14 days in advance of trial. MRE 404(b)(2).

While we agree with defendant that the testimony likely referenced other-acts evidence, we do not agree that this testimony deprived him of a fair trial. The prosecution clearly did not purposefully elicit the testimony, and defense counsel conceded as much. Neither question asked by the prosecutor required defendant's wife to discuss the CPS case or allegations against defendant involving her and her daughter. She gave nonresponsive answers to otherwise permissible questions, and "[a] voluntary and unresponsive statement does not ordinarily constitute error." *People v Kelsey*, 303 Mich 715, 717; 7 NW2d 120 (1942). See also *People v Stegall*, 102 Mich App 147, 151; 301 NW2d 473 (1980) ("A nonresponsive volunteered answer to a proper question is not cause for granting a mistrial.").[3] Given that the testimony was nonresponsive, the prosecution could not have provided notice under MRE 404(b)(2). Furthermore, the trial court immediately provided the jury with a curative instruction, which explicitly instructed the jurors not to consider any of the challenged testimony, and "jurors are presumed to follow the trial court's instructions . . . ." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). Finally, any prejudice was minimal because the testimony of defendant's wife was brief, she did not provide any subsequent similar testimony, the testimony itself was vague and did not contain any specifics about the allegations raised in or nature of the CPS case, and because there was untainted cellphone evidence corroborating much of SMS's testimony. See MCL 769.26; *Lukity*, 460 Mich at 495-496. In sum, we conclude that defendant's argument under MRE 404 does not merit reversal.

---

[2] The Michigan Rules of Evidence underwent sweeping stylistic changes by amendment on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10; 512 Mich lxiii (2023). Our quotation of MRE 404 pertains to the pre-amendment version of the rule, which was applicable at the time of trial.

[3] Published decisions this Court issued on or after November 1, 1990, are precedentially binding. MCR 7.215(J)(1). Although we are "not strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, . . . they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (emphasis omitted).

## C. SENTENCING

Defendant argues that the trial court erred by assessing 10 points for OV 4 and 25 points for OV 12. We disagree. In *People v Horton*, ___ Mich App ___, ___; ___ NW3d ___ (2023); slip op at 12, this Court observed:

> Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. Clear error is established when the appellate court is left with a firm and definite conviction that an error occurred. This Court reviews de novo whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute. In scoring OVs, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination. The trial court may rely on reasonable inferences arising from the record evidence to sustain the scoring of an offense variable. When a preserved scoring error alters the appropriate guidelines range, resentencing is generally required. This Court reviews de novo issues involving the interpretation of the sentencing variables. [Quotation marks, citations, brackets, and ellipsis omitted.]

A "[p]reponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008) (quotation marks and citation omitted).

With respect to the interpretation of a statute, our Supreme Court in *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017), explained:

> When interpreting statutes, we begin with the statute's plain language. In doing so, we examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme. We must give effect to every word, phrase, and clause and avoid an interpretation that would render any part surplusage or nugatory. When the statute's language is unambiguous, the statute must be enforced as written. These same legal principles govern the interpretation of court rules. [Citations omitted.]

"Offense variables must be scored giving consideration to the sentencing offense alone, unless otherwise provided in the particular variable." *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009).

Defendant's appellate challenge regarding the scoring of OV 4 relates solely to the CSAA conviction, and his challenge in connection to the scoring of OV 12 only relates to the CSAA and CSAM convictions. These convictions stemmed from the messages, images, and videos exchanged between defendant and SMS. OV 4 is governed by MCL 777.34, which provides, in relevant part:

> (1) Offense variable 4 is psychological injury to a victim. Score offense variable 4 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

> (a) Serious psychological injury requiring professional treatment occurred to a victim . . . . . . . . . . . . . . . . . . . . . 10 points
>
> .* * *
>
> (2) Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive.

"Because OV 4 does not specifically provide otherwise, we are limited to solely considering the sentencing offense . . . when scoring OV 4." *People v Biddles*, 316 Mich App 148, 167; 896 NW2d 461 (2016).

In the instant case, in her victim-impact statement, SMS remarked that she was "very sad," that she was "insecure" about her body and herself, that she was now scared of males, that defendant manipulated her, and that he was controlling and a good liar. Moreover, SMS was asked how it felt to be so near defendant during the trial, and she replied, "[A] little nervous and a little scared." These various statements demonstrated how defendant's conduct negatively affected her life. SMS felt used, exploited, and manipulated for defendant's own sexual gratification, and those effects continued to burden her more than three years after the offenses. This information in the record sufficed for purposes of OV 4 and the assessment of 10 points. See, e.g., *People v Schrauben*, 314 Mich App 181, 197-198; 886 NW2d 173 (2016) (holding that OV 4 was properly scored at 10 points when the victim stated that life had been a struggle psychologically for three years), overruled in part on other grounds by *People v Posey*, 512 Mich 317, 360-361; 1 NW3d 101 (2023).[4]

With respect to the scoring of OV 12, it is governed by MCL 777.42, which provides, in pertinent part:

---

[4] Defendant raises a brief argument concerning an addendum to the PSIR. He argues that one of the sentences was not an accurate summary of SMS's testimony and should be removed. "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). And defendant provides no authority to support his position that a single sentence summarization of trial testimony is impermissible. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Regardless, there was no dispute that this sentence did not reflect *actual* testimony but, rather, was the prosecution's *summary*, and the trial court was well aware of this fact. The trial testimony spoke for itself, and there is no indication that the trial court substantively relied on the addendum. Furthermore, as already discussed, there was adequate evidence from the trial testimony and victim-impact statement to support the assessment of 10 points for OV 4.

-8-

(1) Offense variable 12 is contemporaneous felonious criminal acts. Score offense variable 12 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) Three or more contemporaneous felonious criminal acts involving crimes against a person were committed . . . . . . . . . . . . . . . 25 points

\* \* \*

(2) All of the following apply to scoring offense variable 12:

(a) A felonious criminal act is contemporaneous if both of the following circumstances exist:

(*i*) The act occurred within 24 hours of the sentencing offense.

(*ii*) The act has not and will not result in a separate conviction.

Possession offenses can be ongoing and may take place over an extended period. See *People v Burgenmeyer*, 461 Mich 431, 439; 606 NW2d 645 (2000).

A detective's forensic report concerning defendant's cellphone usage showed that multiple images and two videos that constituted CSAM were found on defendant's phone. Indeed, for purposes of this issue, defendant does not dispute that the images and videos depicted CSAM. Instead, he argues that he could not have possessed them because they were received on his cellphone on August 29, 2019, at which time he did not have access to his phone. It is true that defendant's wife testified that she took defendant's cellphone on August 27, 2019, and kept it locked away until giving it to the police sometime around September 6, 2019. The forensic report provided that the "modified time" for the images and videos occurred on August 29, 2019. But the detective explained that "modified time" could mean that the file was simply modified, saved, moved, or otherwise altered at the time. He explained that even opening or closing an image could result in modification, and he believed that modification could also occur without anyone accessing the cellphone.

In other words, contrary to defendant's contentions, the modified time did not conclusively demonstrate that the images and videos were first *received* on the cellphone at that time. Therefore, his argument that he could not have possessed the images and videos is unpersuasive. Defendant could have had ongoing possession of these images and videos throughout the time of the CSAA and CSAM activity, which occurred during the summer of 2019 and was continuing *before* his wife took possession of his cellphone. SMS's testimony supported this conclusion because she testified that there were numerous messages and CSAM images sent to defendant in July and August 2019. Therefore, we hold that the evidence adequately supported the trial court's determination that defendant possessed three or more images—constituting contemporaneous felonious criminal acts—within 24 hours of the sentencing offense.

## D. EX POST FACTO PUNISHMENT

Defendant argues that requiring him to register under the 2021 version of SORA for crimes committed when a prior version of the SORA was in effect constituted ex post facto punishment. We review de novo constitutional issues. *Pennington*, 240 Mich App at 191.

Both the United States and Michigan Constitutions prohibit ex post facto laws. US Const, art I, § 10; Const 1963, art 1, § 10. "A law is considered ex post facto if it: (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a [committed] crime; or (4) allows the prosecution to convict on less evidence." *People v Betts*, 507 Mich 527, 542; 968 NW2d 497 (2021) (quotation marks and citation omitted; alteration in original). Ostensibly, the third type of ex post facto law is at issue.

In *Betts*, *id.* at 562, our Supreme Court concluded that although the 2011 version of SORA[5] was intended by our Legislature to constitute a civil regulation, "the 2011 SORA's aggregate punitive effects negate[d] the state's intention to deem it a civil regulation." The Court held that "the retroactive imposition of the 2011 SORA increases registrants' punishment for their committed offenses in violation of federal and state constitutional prohibitions on ex post facto laws." *Id.*[6] In *People v Lymon*, 342 Mich App 46, 88-89; 993 NW2d 24 (2022), this Court held that the requirement to register as a sex offender for 15 years under the 2021 version of SORA constituted cruel or unusual punishment for a registrant whose convictions lacked a sexual component. As part of its analysis, this Court determined that like the 2011 version of SORA, "the 2021 SORA's aggregate punitive effect negate[d] the Legislature's intention to deem it a civil regulation" and, instead, "impose[d] a criminal punishment on a registrant." *Id.* at 81.

In the present case, defendant relies on *Betts* and *Lymon* to summarily argue that because the 2021 version of SORA constitutes criminal punishment, it cannot be applied retroactively for his 2019 criminal acts. Apart from this cursory contention, he fails to provide any further analysis. Defendant fails to identify the differences between the 2021 version of SORA and earlier versions and does not explain how the 2021 version of SORA is more restrictive than the prior versions. In fact, he fails to provide *any* description or discussion whatsoever of the SORA, its history, or its contents. Moreover, defendant does not even contend that the 2021 version of SORA is more punitive than previous versions. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). We note that neither *Betts* nor *Lymon* addressed whether the 2021 version of SORA as a whole was more punitive than the 2011 version of SORA or any other prior version. Indeed, the *Lymon* panel stated that "[i]n light of the uncertainty of the 2021 SORA's efficacy at decreasing recidivism, we conclude that the restraints it imposed were excessive, *even though there were fewer restraints in the 2021 SORA than in the 2011 SORA*." *Lymon*, 342 Mich App at 80 (emphasis added). In view of defendant's inadequate briefing on the matter, he has not

---

[5] MCL 28.721 *et seq.*, as amended by 2011 PA 17 and 18.

[6] The defendant in *Betts* was convicted by plea in 1993 and was accused of violating the 2011 version of SORA in 2012. *Id.* at 536-537.

demonstrated that application of the 2021 version of SORA increased his punishment from what he would experience on application of the version that was in effect at the time he committed CSC-III. Accordingly, we conclude that defendant has not established a violation of the constitutional prohibition against ex post facto laws.

## E.  CRUEL OR UNUSUAL PUNISHMENT

Finally, defendant argues that mandatory lifetime registration under SORA for his CSC-III conviction constitutes cruel and unusual punishment under the United States Constitution and cruel or unusual punishment under the Michigan Constitution. We disagree. This Court reviews de novo constitutional issues. *Pennington*, 240 Mich App at 191.

The United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII, whereas the Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16. The language in the Michigan Constitution is broader and provides greater protection than the United States Constitution. *People v Stovall*, 510 Mich 301, 313-314; 987 NW2d 85 (2022). Therefore, if a punishment is not cruel or unusual under the Michigan Constitution, it necessarily will not violate the United States Constitution. See *Lymon*, 342 Mich App at 82. Consequently, we confine our analysis to the Michigan Constitution.

Under SORA, tier III offenses require registration for life, MCL 28.725(13), and defendant was convicted of a tier III offense—CSC-III (by force or coercion), MCL 28.722(i); MCL 28.722(v)(*iv*). As this Court previously explained, registering

> under SORA imposes affirmative obligations amounting to an onerous burden on registrants. These obligations for a Tier III offender include reporting life changes such as a change in residence, employment, e-mail address, or telephone number, and reporting in person four times per year to verify residence. Certain biographical and personal information about [the defendant], such as his address, license plate number, physical description, and photograph, must also be made available on a public website. [*People v Jarrell*, 344 Mich App 464, 484; 1 NW3d 359 (2022) (quotation marks and citations omitted).]

"A party challenging the constitutionality of a statute has the burden of proving its invalidity." *Id*. Challenges may be either "facial" or "as applied." *Id*. at 482. "A facial challenge involves a claim that there is no set of circumstances under which the enactment is constitutionally valid, while an as-applied challenge considers the specific application of a facially valid law to individual facts." *Id*. (quotation marks and citations omitted). In the present case, defendant's argument constitutes an as-applied constitutional challenge.

As a threshold matter, there must first be "punishment" in order for the cruel or unusual prohibition to apply. *Id*. at 483. As previously discussed, this Court held that the 2021 version of SORA constitutes criminal punishment. *Lymon*, 342 Mich App at 81. To determine whether a punishment is cruel or unusual, we must

> assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity

-11-

of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. [*Jarrell*, 344 Mich App at 484 (quotation marks and citations omitted).]

This Court has held that it was not cruel or unusual punishment to require lifetime registration under SORA for a defendant convicted of CSC-I,[7] *Jarrell*, 344 Mich App at 487, or for a juvenile defendant convicted of CSC-II,[8] *People v Malone*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 331903); slip op at 8.

Under the first factor, we cannot conclude that mandatory lifetime registration is a disproportionately harsh penalty in light of the gravity of defendant's CSC-III offense. CSC-III is punishable by a maximum prison sentence of 15 years. MCL 750.520d(2). Additionally, defendant was convicted of CSC-III on the basis that he sexually penetrated SMS through the use of force or coercion. Our Legislature distinguished the offense of CSC-III like that charged in this case—penetration by force or coercion—from those in which "the victim consented to the conduct constituting the violation, . . . the victim was at least 13 years of age but less than 16 years of age at the time of the offense, [or] . . . the individual [was] not more than 4 years older than the victim." MCL 28.722(v)(*iv*). In the latter three circumstances, CSC-III is not a tier III offense and does not subject the defendant to mandatory lifetime registration. *Id.*

Furthermore, the facts of this case established that defendant's conduct in committing CSC-III was grave and egregious. Defendant, who was 50 years old, manipulated, exploited, and groomed a 16-year-old vulnerable victim for his own sexual gratification. This behavior, which initially entailed messages, images, and videos, led to two sexual assaults, one of which culminated in defendant's sexually penetrating SMS with his fingers. The evidence supports the inference that during this sexual assault, defendant used his age, his strength, and the element of surprise to overcome SMS. The seriousness of the offense is further supported by evidence of the impact on SMS, who explained that she had ongoing "nightmares" and was often "startled" in the presence of men. Cf. *People v Dipiazza*, 286 Mich App 137, 153-154; 778 NW2d 264 (2009) (holding that 10 years of registration under SORA for attempted CSC-III was harsh in comparison to the offense where the defendant was 18 years old, the victim was 15 years old, the relationship was consensual, the victim's parents were aware of the relationship and allowed it, and the defendant subsequently married the victim).

With respect to the second factor, we cannot conclude that mandatory lifetime registration is unduly harsh when compared to other penalties imposed for various offenses in Michigan. We agree with the following observations made by this Court in *Malone*, ___ Mich App at ___; slip op at 6:

---

[7] MCL 750.520b.

[8] MCL 750.520c.

Lifetime registration, however, is not the only mandatory penalty imposed in Michigan. Mandatory lifetime imprisonment is the penalty imposed for first-degree murder, MCL 750.316(2). Two years' imprisonment is the mandatory punishment for the possession of a firearm during the commission of a felony, MCL 750.227b(1). A second conviction results in the mandatory punishment of five years' imprisonment, and a third conviction is subject to a mandatory 10-year period. *Id*. Additionally, certain CSC-I convictions may impose a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). A sentence mandated by the Legislature is presumptively proportional and presumptively valid. *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). A proportionate sentence is not a cruel or unusual punishment. See *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). The Legislature has determined offenses for which mandatory punishments are warranted, including murder, weapon, and sex offenses, without regard to the age of the offender. These mandates are presumptively proportional and valid.[9]

With respect to the third factor, this Court has noted that "mandatory lifetime sex offender registration is not unique to Michigan. Many states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault." *Jarrell*, 344 Mich App at 486. See also *Malone*, ___ Mich App at ___; slip op at 7 (finding unpersuasive the argument "that only 18 states have substantially implemented the federal Sex Offenders Registration and Notification Act, 42 USC 16901 *et seq*., there is no uniform view that these registries operate to improve public safety, and research indicates that the dangerousness of sex offenders had been 'overblown' ").

In regard to the fourth factor, this Court has held that mandatory lifetime registration does not assist in a defendant's rehabilitation. *Jarrell*, 344 Mich App at 486. But the *Jarrell* panel also ruled:

> [W]hile lifetime registration under SORA does not advance the goal of rehabilitation, the other three factors strongly support that such a punishment is neither cruel nor unusual as applied to Jarrell's CSC-I convictions. Therefore, we

---

[9] We also note and heed the Legislature's declaration in MCL 28.721a:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger.

conclude that SORA's lifetime-registration requirement is not unjustifiably disproportionate under the circumstances of this case.  [*Id.* at 486-487.]

We reach the same conclusion in this case.  See also *Malone*, ___ Mich App at ___; slip op at 8.

We affirm.

/s/ Jane E. Markey
/s/ Michael J. Riordan
/s/ Thomas C. Cameron